**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC, d/b/a BRAZOS LICENSING AND DEVELOPMENT<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Civil Action No. 6:20-cv-00460<br>Civil Action No. 6:20-cv-00462<br>Civil Action No. 6:20-cv-00464 |

**<u>DEFENDANT'S RESPONSIVE MARKMAN BRIEF</u>**

## TABLE OF CONTENTS

I.   THE '727 CLAIM TERMS ...................................................................................1

   A.   The Problem To Be Solved By The '727 Patent.............................................1

   B.   Disputed Terms .............................................................................................2

      1.   "determine / determining …"  (Claims 1 and 11)....................................2

      2.   "set of resources" (Claims 1, 6, 7, 11, and 16) .....................................4

II.  THE '519 CLAIM TERMS ...................................................................................7

   A.   The Problem To Be Solved By The '519 Patent.............................................7

   B.   Disputed Terms .............................................................................................8

      1.   "automatically" / "automatic" (Claims 1 and 12) ..................................8

III. THE '758 CLAIM TERMS .................................................................................10

   A.   The Problem To Be Solved By The '758 Patent...........................................10

   B.   Disputed Terms ...........................................................................................11

      1.   "a plurality of parameter values … for communication services …" (Claims 1 and 8) ..............................................................................................11

      2.   "a plurality of parameter values … for the communication service …" (Claims 18 and 19 .............................................................................................14

      3.   "accessing, dynamically, …" (Claim 1) ...............................................14

      4.   "dynamically determining a rule for charging a sponsor of said communication service" (Claims 8 and 10)......................................................17

      5.   "a first cost …" (Claim 2) .....................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ...................................................................................... 8, 10, 19

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................................................. 4, 9

*In re Varma*,
    816 F.3d 1352 (Fed. Cir. 2016) ................................................................................ 9

Microsoft submits this brief in response to WSOU's Opening Claim Construction Brief (Dkt. 47) addressing terms of U.S. Patent No. 7,106,727 ("the '727 patent"), which is asserted against Microsoft Skype for Business, and U.S. Patent Nos. 7,706,519 (the '519 patent") and 8,625,758 ("the '758 patent"), which are asserted against Microsoft Skype.

This brief addresses the eight claim terms or phrases that the parties dispute across these three patents.  As to each term, WSOU contends only that "plain and ordinary" meaning applies, and as to each term WSOU does not say what the plain and ordinary meaning is.  Microsoft's proposed constructions are set out as to each term below.[1]

## I.    THE '727 CLAIM TERMS

### A.    The Problem To Be Solved By The '727 Patent

The '727 patent (EX. 1) is directed to communication networks capable of handling calls that rely on two different technologies. EX. 1 at 1:8-10.  The first type—circuit-switched calls—sends signals over a connection from a starting point to an ending point that is dedicated to that call. *Id*. at 1:25-33. Circuit-switching was used for traditional voice communications.  *Id*. at 1:21-22.  The second type—packet-switched calls—packages the data into discrete blocks (called packets) and sends them to the desired destination, where they are reassembled.  *Id*. at 1:35-37. Packet-switched calls are thus able to share a single network connection because the packets for different calls may be interspersed. *Id*. at 1:55-57.  Packet-switching has become more widely used with the need for data transmissions.  *Id*. at 1:22-24. The '727 patent describes that prior art networks were "designed either exclusively for circuit switching or exclusively for packet switching," requiring network service providers to build "two separate networks, a circuit-switched network for voice calls and a packet-switched network for data calls."  *Id.* at 1:58-2:2. This approach resulted in increased cost and complexity.  *Id.*

---

[1] Emphases are added throughout, unless otherwise indicated.

Against this backdrop, the '727 patent aims to address how to allocate resources for handling both circuit-switched and packet-switched calls in a single communication network. Its solution is to measure the plurality of calls on the network and then provide one set of resources for the use of circuit-switched calls and another set of resources for the use of packet-switched calls. *Id.* at 2:26-36. Network switches in the communication network are responsible for allocating and reallocating the resources between them. *Id.* at 3:9-11.

The allocation of resources occurs dynamically to accommodate changing resource needs for circuit-switched versus packet-switched calls and may be driven by the demands of either or both the circuit-switched and packet-switched calls. *Id.* at 2:62-3:1; 4:4-6. Traffic may be measured periodically or on demand to determine the bits per second of traffic, distribution by percentage of traffic or percentage of total bandwidth between circuit- and packet-switched calls, or count of current circuit- and packet-switched calls. *Id.* at 4:31-52.

**B.   Disputed Terms**

**1.   "determine / determining …"  (Claims 1 and 11)**

| Claim Language | Microsoft's Proposed Construction |
|---|---|
| determine/determining a measure of the plurality of calls | measuring the number and type of calls on the network |

Microsoft's proposed construction of this term is rooted in the objective of the '727 patent, which aims to improve handling circuit-switched and packet-switched on a single network, and its proposed solution, *i.e.*, repeatedly measuring the current amount and blend of traffic on the network and reallocates network resources based on that measurement. The claimed system maintains a pool of resources to be allocated as between the two types of calls based on the results of the measurements.

The asserted independent claims include mirrored limitations directed to the described measuring operation.  Claim 1 recites "determining a measure of the plurality of calls," while

2

claim 11 recites "determine a measure of the plurality of calls."  Both claims direct the "determine/determining the measure" operation to the circuit-switched and packet-switched calls received at a local switch.  See *Id*. at Claims 1 and 11.  Neither claim further describes this step.

At the outset, "determine/determining a measure" is not conventional English phrasing. However, the specification, which includes at times the same awkward phrasing, explains what is intended: the act of "measuring."  Measuring the current traffic/calls on the network is the fundamental operation of the described invention.  "[P]acket-switched call(s) and circuit-switched call(s) are received at the access network 105, for example, by a packet switch 109, a circuit switch 113, and/or edge switch 107." *Id*. at 4:26-28.  Subsequently, "[t]raffic ***is measured*** periodically or on demand, for example, at the edge switch 107. When traffic is ***to be measured*** at step 303, the process continues with step 305, where a measure of calls received at step 301 is determined." *Id*. at 4:31-34.  Indeed, step 303 asks whether to "measure traffic?" *Id*. at Fig. 3. If the answer is "yes," the patented process advances to step 305 to do so.  As labeled, Step 305 ties the "determine a measure" language directly to the act of "measuring."  Although awkwardly phrased, measuring is a determination of a measure of the calls received.  Indeed, the specification follows step 305 immediately by describing how the results of the measuring operation are used for dynamic allocation of resources: "[a]t step 307, it is determined whether a resource allocation threshold is met, *i.e.*, whether a difference in traffic between a previous ***measure*** of traffic ***and the current measure*** of traffic is sufficient to reallocate resources between circuit-switched and packet-switched resources." *Id*. at 4:53-57.  And "[i]f the threshold is met, the process continues with step 309, where resources are allocated, or reallocated, ***based on the current measure of traffic***, *i.e.*, packet-switched call(s) and circuit-switched call(s)." *Id*. at 4:63-66. Thus, it would be understood that "determining a measure" comprises measuring the

current traffic/calls, and the resulting measurement is then compared to a threshold for allocation or reallocation.

Beyond wrongly suggesting that the claims employ everyday English phrasing, WSOU appears to take issue only with clarifying that what is being measured is the "number and type of calls." Dkt. 47 at 3.  But WSOU does not contend that measuring would make any sense if the number of calls was not measured.  And, measuring the "types" of calls is central to the claimed purpose of reallocating resources as between the call types, circuit-switched and packet-switched.  The patent leaves open-ended how the measuring is performed,.  *See e.g.*, EX. 1 at 4:31-52, as does Microsoft's proposed construction.  Contrary to WSOU's argument, Microsoft's definition neither specifies nor excludes any specific method for measuring.

### 2. "set of resources" (Claims 1, 6, 7, 11, and 16)

| Claim Language | Microsoft's Proposed Construction |
|---|---|
| set of resources | a part of a pool of physical network resources, each capable of handling circuit-switched and packet-switched formats |

The invention described in the '727 patent seeks to dynamically allocate finite network resources among different types of calls, circuit-switched and packet-switched.  For that dynamic allocation to work, the resources that are to be allocated to *either* circuit-switched calls or to packet-switched calls based on measuring the current traffic logically must be capable of handling both circuit-switched and packet-switched calls. This is how "resources" are described in the patent specification. And this is how the term "resources" is used in the claims in referring to a pool of network infrastructure allocated as needed to handle either circuit-switched or packet-switched calls.

The term "resources" is not a term of art, and in everyday vernacular may refer to a broad range of things. But this term was used in the claims to refer to specific items that are central to

4

the improvement that the claims are said to provide, and its scope must be consistent with those claims and the specification.  *See Phillips v. AWH Corp*., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (internal citations and quotations omitted) ("[T]he claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose.").  The phrase "set of resources" also does nothing to inform the meaning of "resources."  WSOU's suggestion that resources should be given its plain and ordinary meaning, without articulating that meaning or where it can be found, leaves the jury to speculate as to the meaning of the term.

In the claims, a "plurality of resources between the local switch and the network switch" is available to be allocated for handling circuit-switched calls ***or*** for handling packet-switched calls. From that pool of "resources," a "first set" is allocated to at least one circuit-switched call, and a "second set" is allocated to at least one packet-switched call.  Both the first and second "sets" are allocated from the same "plurality of resources."  The claims do not differentiate among the resources contained in the "plurality of resources," but merely recite that they are allocated in sets to either circuit-switched or packet-switched calls – again without any differentiation among the resources.

The specification further, specifically, describes the resources that are located, as the claim requires, "between the local switch and the network switch."  *See* EX. 1 at 3:39-45.  The patent expressly states that "both circuit-switched and packet-switched resources are provided between each pair of switches, and ***each physical resource is capable of handling circuit-switched and packet-switched formats***" *Id*. at 3:26-30.  These are the resources to be allocated between different call types, specifically circuit-switched and packet-switched calls, as the claims require.  The only way that is possible is if each resource in the pool of physical network resources is capable of handling circuit-switched and packet-switched formats, as the specification

expressly states.  In that way, pursuant to the described invention, at any given time, part of the pool is allocated to circuit-switched calls and part of the pool is allocated to packet-switched calls, and that allocation can be changed. Whether any given resource in the claimed "plurality" is allocated to circuit-switched calls or to packet-switched calls at any given moment depends on the result of the measuring step described above. But each resource must be able to handle both so that it can be allocated to either.

WSOU argues that the inclusion of "capable of handling circuit-switched and packet-switched formats" in Microsoft's proposed definition improperly imports limitations from the specification. WSOU specifically notes that the specification states that "[t]he present invention may also be applied to additional types of resources, *i.e.*, to allocate and reallocate resources between two or more types of resources." *Id*. at 7:65-67.  But the claims at issue here specifically draw from the same, undifferentiated pool or "plurality of resources" to allocate individual resources as sets for either packet-switched or circuit-switched calls. And, when the patent describes its own "teachings," it explains that "[w]hen traffic patterns change, the network is able to dynamically reallocate resources ***between*** circuit and packet to better serve current demands." *Id*. at 8:1, 8:4-6.  The patented system could not "reallocate resources ***between*** circuit and packet" if the resources being reallocated, as in claim 1, were not capable of handling both circuit-switched calls and packet-switched calls.

WSOU also wrongly objects to the use of "physical network resources" in Microsoft's proposed construction.  Yet Microsoft seeks only to be consistent with the specification that specifically describes the resources being allocated as "physical resources," *Id*. at 3:26-30. Likewise, the prosecution history supports Microsoft's proposed construction.  For example, during prosecution, in discussing the meaning of "resources" as used in the claims, the applicant stated resources refers to "***the infrastructure used to provide services***" rather than "specific

types of traffic." EX. 2 at 2. Infrastructure necessarily constitutes physical resources, as Microsoft proposes.  Moreover, WSOU never explains what network resources would be anything other than physical.

Microsoft's construction is consistent with the specific meaning of the term as described in the specification, claims, and prosecution history, and should be adopted.

## II.     THE '519 CLAIM TERMS

### A.     The Problem To Be Solved By The '519 Patent

The '519 patent (EX. 3) is directed to the concept of allowing a telephonic station (*i.e.,* a telephonic endpoint) to appear as if it is physically resident in a particular location regardless of its actual location. EX. 3 at 1:6-9.  The patent calls this being "virtually resident." *Id.*

Conventional telephonic networks employed circuit-switching, where a dedicated connection was allocated to a telephonic station. *Id.* at 1:50-60.  This type of system was highly inflexible, and moving the telephonic station to another point in the network would require call forwarding, purchase of a toll-free number, or other inconvenient and potentially expensive options. *See Id.* at 2:54-65. But with the advent of packet data networks (*i.e.*, the Internet) and packet-switched calls, telephonic stations could be moved easily to other points of the network. *Id.* at 2:52-54. The '519 patent attempts to make it easier to change the location of a telephonic station in a packet data network that co-exists with conventional, legacy networks.

The '519 patent, then, describes routing a call to a telephonic station using a packet data network, where an index is used to determine the address of the virtually resident telephonic station on the network. *Id.* at 2:66-3:9.  If the virtually resident endpoint is moved from a first telephonic network to another location in the packet data network, the index is updated with the new address, so that the endpoint continues to appear as if it is in its original location. *Id.* at 4:21-31.

7

**B.     Disputed Terms**

    **1.      "automatically" / "automatic" (Claims 1 and 12)**

| Claim Language | Microsoft's Proposed Construction |
|---|---|
| "automatically" / "automatic" | Indefinite |

The Court should determine whether the "automatic" terms in certain '519 patent claims have an understood meaning and, if so, identify that meaning. Microsoft contends that this term, pulled from outside the patent document and inserted without explanation into these claims to secure their allowance, renders the scope of those claims indefinite.  WSOU merely states that the term is "widely used and understood," Dkt. 47 at 5, but offers no clue as to what it believes the "automatic" terms mean.  At bottom, though, the meaning of this term as used in the claims will determine whether the claims sufficiently "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

The meaning of the "automatic" term is the lynchpin to USPTO's issuance of the asserted claims. "Automatically" does not appear in the 519 Patent specification or drawings.  It did not appear in the claims either, until the final amendment during prosecution.  When it was added throughout the claims in the final amendment, neither the examiner nor the applicant discussed its meaning. *See* EX. 4 at 15.  But, following the addition of the "automatic" terms, the examiner withdrew the rejections and issued the asserted claims.  EX. 7 at 2.

Resolving the parties' dispute requires understanding the use of the "automatic" terms in the claims, not in a vacuum. For example, in Claim 1, "automatically" was inserted four times, as highlighted below.

    1. In a communication network having at least a first calling station connected to a first telephonic network and a service-user calling station **<u>automatically</u>** connected to a packet-

based network, an improvement of an assembly for facilitating call connection between the first calling station and the service-user calling station, the service-user calling station having at least a first virtual calling-station identity in the first telephonic network such that the service-user calling station appears virtually resident in the first telephonic network, said assembly comprising:

a virtual-location indexer embodied at the packet-based network, said indexer for **automatically** indexing together the at least the first virtual calling-station identity of the service-user calling station with a selected packet-based-network identity of the service-user calling station,

the packet-based-network identity **automatically** associated with logical connection of the service-user calling station to the packet data network and the virtual calling-station identity associated with a virtual residency location of the service-user calling station in the first telephonic network,

said indexer **automatically** accessed pursuant to call routing of a call between the first calling station and the service-user calling station to permit effectuation of the call connection therebetween, wherein the call connection is local to the first telephonic network, while permitting the service-user calling station to be physically located at another location.

As shown, "automatically" is used as an adverb to modify four different actions recited in the claim: "connected," "indexing," "associated," and "accessed."  By law, using the same term repeatedly within a claim presumes the same meaning in each instance.  *See In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016); *see also*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).  And, because this amendment secured allowance, adding "automatically" means that simply performing the steps in any possible manner cannot be sufficient to infringe this claim; all of these four steps must be performed "automatically."  Moreover, whatever meaning is attached now to "automatically," that meaning must distinguish the asserted claims from the prior art over which the examiner was rejecting the claims at the PTO.  None of the relevant cited art, however, offers a definition of "automatic," so its meaning must be found in how corresponding operations were performed in that art.

One principal prior art reference, the Cho published application, offers insight for this analysis. Cho also described a system for completing voice calls on a packet switched network, but in Cho users were required to provide information upon logging onto the packet-switched network so that the system could authenticate that user and connect calls directed to that user. EX. 4 at 12-15 . Presumably, requiring that the analogous operation in the 519 claims occur "automatically" would be understood to mean that they occur without the user being involved. The '519 patent, however, never explains how any of these steps are performed "automatically," instead only stating in general terms the result that somehow entails. EX. 3 at 7:57-60.

Going beyond the prior art of record and considering the everyday English lexicon, "automatic" may have multiple possible meanings as an adverb as shown by the Webster's Desk Dictionary that WSOU cited as extrinsic evidence for the '519 patent.[2] For example, "automatic" could mean without human intervention, involuntary, reflexive, or done mechanically or by habit But neither the '519 patent specification, the asserted claims, nor the prosecution record makes it clear. Nor does WSOU explain which of the four definitions it believes applies.

The claims containing the "automatic" / "automatically" clauses are therefore indefinite because they do not, when "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

III.    **THE '758 CLAIM TERMS**

    A.    **The Problem To Be Solved By The '758 Patent**

---

[2] Automatic. - *adj*. 1. capable of operating independently of human intervention. 2. involuntary; reflex. 3. done unconsciously or form force of habit; mechanical. 4. (of a firearm) capable of continuous operation. – *n*. 5. an automatic machine or device, esp. a pistol. Webster's Desk Dictionary, 1993, p. 141.

The '758 patent (EX. 5) describes a system that allows sponsoring a communication service within a larger telecommunications network, where the cost, in whole or in part, is charged to a sponsor based on a dynamically determined rule. *See* EX. 5 at 1: 44-62.  Prior systems of this kind came in various permutations, including those that required a caller to listen to an ad before the call would be place through to the intended recipient. See *e.g*., *Id*. at 1:14-26 (describing a previously published Alcatel-Lucent India patent application).  The '758 patent seeks to expand the options for rules for charging the service sponsor.  *See e.g*., *Id*. at 1:66-2:6; 2:13-16; 2:28-33.  The asserted claims, for example, require that the rule be based on at least two parameters, one of which must be something other than the identity of the originator of the request for communication services  (*e.g*., the caller), the intended recipient of the requested communication services  (*e.g*., the called party), or the identity of the sponsor.  *Id*. at Claim 1 and Claim 18.

   B.   **Disputed Terms**

      1.   **"a plurality of parameter values … for communication services …"**
           **(Claims 1 and 8)**

| Claim Language | Microsoft's Proposed Construction |
|---|---|
| a plurality of parameter values including at least one respective value of at least one respective parameter other than an identity of an originator of the request for communication services, an intended recipient of a communication of the requested communication services and an identity of the sponsor | a plurality of parameter values, one of which must be something other than the location/ country code of the phone number of an originator of the request for communication services, the location/ country code of the phone number of the intended recipient of a communication of the requested communication services, or the identity of the sponsor |

   Although the claim language is confusing and WSOU fixates on Microsoft's obvious typo[3] in the exchanged construction drafts, the term presents only a minor issue for resolution –

---

[3] WSOU dwells on an obvious typo in Microsoft's proposed construction as exchanged, where the phrase "of the recipient of an originator" was inadvertently included.  Microsoft's

namely, whether the disputed claim language includes phones numbers.  WSOU dodges

addressing that issue directly, and simply urges that plain and ordinary meaning applies. It does

not explain what that meaning is, or whether it would include phone numbers.  The most that

WSOU explains is that "there is nothing in Defendant's proposed construction that indicates any

confusion as to the plain meaning of the term itself."  Presumably, by that statement, WSOU

agrees that Microsoft's construction falls within the disputed language, even if it also contends

that this language encompasses additional possibilities.   Assuming that Microsoft is reading

WSOU's statement correctly, Microsoft agrees.  Indeed, as the intrinsic evidence unambiguously

demonstrates, a phone number, in whole or in part, is <u>an</u> identifier for a caller or the called party.

The bulk of WSOU's arguments misapprehend Microsoft's proposed construction, which

does not seek to narrow this claim to restrict the 'identity' of an originator of the request and an

intended recipient of a communication to 'the location / country code of the phone number of'

each respective entity."  Rather, Microsoft's proposed construction is open-ended language

relating to the location / country code of the phone number of the originator and intended

recipient. It clarifies, consistent with the specification, that the identity of the originator or

intended recipient includes *at least* that entity's local, national, or international phone number.

Thus, the key dispute is whether "an originator" and "an intended recipient of a communication

of the requested communication services" can be identified within the meaning of this claim

using the local, national, or international phone number thereof.

---

construction was intended to read "a plurality of parameter values, one of which must be
something other than the location/ country code of the phone number of the recipient of an
originator of the request for communication services, the location/ country code of the phone
number of the intended recipient of a communication of the requested communication services,
or the identity of the sponsor." This mistake was obvious and any actual confusion could have
been resolved with a phone call in lieu of briefing.

The intrinsic record unequivocally demonstrates that an identity of the originator or the intended recipient may be the "local, national, or international phone number" of the caller or called party or their device.  *See* Ex. 5 at 3:14-34; *see also*, *Id*. at 4:4-25. As has been understood by phone users throughout recent memory, whether a phone number is local, national, or international is based upon location codes such as area codes or country codes.  Microsoft does not contend that the location or country code of the originator's or recipient's phone number is the *only* criteria that can be an identity of an originator or intended recipient, as WSOU seems to imply.  Certainly other information also can serve as an identifier of the originator or intended recipient.

The prosecution history further confirms that "an identity" of "an originator"  or "an intended recipient of a communication of the requested communication services" includes the local, national, or international phone number thereof.  To overcome a rejection, the applicant relied upon paragraphs 41-51 of the published application (which became Col. 4, ll. 4-37 of the issued patent):

> [0041] Said sponsorship database 205 contains at least one sponsorship rule SR that defines the terms of sponsorship between a sponsor and said first user for example depending on:
>
> [0042] A fourth identifier of an originator of said communication service, *e.g.* the local, national or international phone number of said first user device 101,
>
> [0043] A fifth identifier of a recipient of said communication service, *e.g.* the local, national or international phone number of said second user device 102,
>
> . . .

EX. 6 at 8-10.  The applicant then argued that "[i]n the given example described beginning with paragraph 41 above, the output of the rule can be a function of ***the identity of the communication originator***, ***identity of the communication recipient***, the type of service, the user location, the direction of the communication (*e.g.*, incoming or outgoing) and so on." *Id*. at

13

10.  Thus, the applicant confirmed that an identity of the originator corresponds at least to paragraph 42 and the identity of the recipient corresponds at least to paragraph 43 – both of which includes that party's "local, national, or international phone number."

Hence, the meaning of the terms "an identity of an originator" and "an intended recipient of a communication of the requested communication services" in the context of these claims must encompass the local, national, or international phone number thereof  These terms are not limited to the phone number, but they are necessarily anchored by them.  To ignore the importance of the phone number is to ignore the the context of the claims, the specification, and the express statements made in the prosecution history.

### 2.  "a plurality of parameter values … for the communication service …" (Claims 18 and 19

| Claim Language | Microsoft's Proposed Construction |
|---|---|
| a plurality of parameter values including at least one respective value of at least one respective parameter other than an identity of an originator of a request for the communication service, an intended recipient of a communication of the requested communication service and an identity of the sponsor | a plurality of parameter values, one of which must be something other than the location/ country code of the phone number of an originator of the request for communication services, the location/ country code of the phone number of the intended recipient of a communication of the requested communication services, or the identity of the sponsor |

Microsoft agrees with WSOU that this term presents the same issues as the prior term, should be resolved in the same manner, and does not require separate consideration.

### 3.  "accessing, dynamically, …" (Claim 1)

| Claim Language | Microsoft's Proposed Construction |
|---|---|
| accessing, dynamically, a rule for charging a sponsor of said communication services | selecting in real-time which rule from a set of rules is applicable for charging a sponsor of said communication service |

The fundamental disputes in relation to this disputed phrase centers on the combined words "accessing, dynamically."  Although WSOU urges no construction, it disputes whether 1)

"accessing" must refer to a rule that already exists and 2) whether "dynamically" means as each event occurs.  The language of the claim and the corresponding description in the patent, however, reveal that Microsoft's construction is correct, and WSOU's proposed lack of any construction would leave the jury free to construe this phrase contrary to the patent's teachings.

In the context of the suggested 758 patent improvement, the term "accessing, dynamically, a rule" plainly relates to the disclosed idea that different rules might be used at different times in assessing charges for the sponsor.  That term, "accessing, dynamically," does not appear precisely within the specification, and is used for the first time in Claim 1. "Accessing" on its own commonly refers to everyday activities, such as accessing a web page or a book from a library.   The specification, however, does use the term "dynamically" in describing how rules are swapped in and out.  *See* EX. 5 at Abstract ("wherein a rule, in particular applicable for charging a sponsor of said communication service, is determined dynamically."); *Id*. at 1:44-49 (as part of "[t]he main idea of the invention"); *Id*. at 5:39-41 ("Said balance management server 201 determines said rule R dynamically depending on said at least one sponsorship rule SR");  *Id*. at 6:14 ("In step 303 said rule R is determined dynamically").  The patent then goes on to describe the referenced "dynamic" operation, in which the system searches for and "finds" the applicable rule for charging the sponsor, and by which the charging rule can be changed from one charging event to the next. *See Id*. at 6:14-22.

Particularly as to this unique phrasing, WSOU's contention that a plain and ordinary meaning without any direction as to what that meaning might be invites juror confusion and error.  Moreover, each of its objections to Microsoft's effort to clarify either leaves the jury to find its own way with ambiguous phrasing or seeks to avoid resolving the core confusion or dispute.  For example, although WSOU objects to the use of "in real-time" in Microsoft's

15

proposed construction, it does nothing to explain the meaning of "dynamically" within the context of the claim.  Dkt. 47 at 5.  WSOU further seeks to override the specification's description of the rule selection process in arguing that the claims do not require that the rule be accessed or selected from a set of existing rules and that instead a rule "may be determined," apparently referring to how rules are constructed in the first place. *Id*. at 6.  But WSOU makes no attempt to explain how a system could "access" (as the claim expressly requires) or "find" (as the specification describes) a rule that did not already exist in order to charge a sponsor for an event that is occurring. It would be error to follow WSOU's proposed path.

The asserted claims, in fact, track the suggested invention that the specification describes. The system that the patent describes provides for "dynamically determining" a rule for charging a sponsor based on a sponsorship rule and one or more additional criteria.  *See* EX. 5 at 5:39-50. The patent explains that a "sponsorship database 205 contains at least one sponsorship rule SR that defines the terms of sponsorship between a sponsor and said first user."  *Id*. at 4:4-6.  And "said sponsorship rule SR contains a rule R for determining the amount that is sponsored by said sponsor." *Id*. at 4:38-39.  Microsoft's proposed construction correspondingly tracks this same substance. Indeed, it would make no sense for the patent to describe the patented system "accessing" a rule contained in the sponsorship database if that rule did not already exist.

The specification further describes the process for retrieving and applying a rule for changing a sponsor consistent with Microsoft's proposed construction in two places:

> "The method starts as soon as an charging event CE for example from a phone call made by said first user operating said first user device 101, is received by said billing center 104. … In step 303 said rule R is determined dynamically. ***Said rule R is determined for example by firstly extracting said first identifier from said charging event CE and secondly by searching said at least one sponsorship rule SR that maps said first identifier to said rule R***. For example by ***finding*** said at least one sponsorship rule SR in which said fourth identifier is included and

matches said first identifier. If no sponsorship rule SR is ***found***, said rule R is set to be invalid, for example by setting said first values to Zero."

*Id*. at 5:62-6:22.

"According to said second embodiment step 303 of said first embodiment is modified to determine said rule R depending on said advertisement data record ADR. ***Said rule R is for example determined from said at least one sponsorship rule SR contained in said advertisement data record ADR. If no advertisement data record ADR is available, said rule R is determined according to the method of said first embodiment.***"

*Id*. at 9:12-18.  As described, the patented system reacts to a charging event, and extracts an applicable rule for charging the sponsor for that event from its database of rules.  The patent expressly refers to the rule applied through this process as being "determined dynamically." Moreover, the patent further states that if no valid sponsorship rule is found in the database, the charging effort fails. *Id*. at 6:20-22.

Thus, in light of the specification and the plain language of the claim, a person of ordinary skill would understand "accessing, dynamically, a rule for charging a sponsor of said communication services" to mean a method whereby upon the occurrence of a charging event (*i.e.* in real-time or when it happens), a search is conducted to find the corresponding rule (*i.e.* selected) from a database of sponsorship rules or an advertisement data record (*i.e.* from a set of rules) the rule that maps to an identifier from the instant charging event (*i.e.* applicable for charging a sponsor).

### 4.  "dynamically determining a rule for charging a sponsor of said communication service" (Claims 8 and 10)

| Claim Language | Microsoft's Proposed Construction |
| --- | --- |
| dynamically determining a rule for charging a sponsor of said communication service | selecting in real-time which rule from a set of rules is applicable for charging a sponsor of said communication service |

Microsoft understands that WSOU contends that "accessing, dynamically …" and "dynamically determining" have the same meaning. Microsoft agrees. As described in the prior section, Microsoft submits that the disputed claim phrase "accessing, dynamically, …" and the claim phrase "dynamically determining a rule for charging a sponsor …" are used synonymously and should be construed the same; Microsoft accordingly incorporates by reference the arguments made in the prior section.

###### 5.      "a first cost …" (Claim 2)

| Claim Language | Microsoft's Proposed Construction |
|---|---|
| a first cost for the usage of said communication service is charged at least partially to said sponsor, by determining a second cost, the second cost depending on said rule and said first cost | Indefinite |

WSOU's argument that this term should be given its plain and ordinary meaning actually demonstrates the term lacks a definite meaning. WSOU's explanation rests upon accepting, contrary to the express language of the claim, that the "first cost" is <u>not</u> charged to the sponsor as the claim says, but instead the "second cost" is charged to the sponsor. WSOU offers a series of postulated formulas, which it suggests represent this claim language, to support its reading. But Claim 2 specifically states "[t]he method of claim 1, wherein *a first cost for the usage* of said communication service *is charged at least partially to said sponsor*." The claim provides no indication of how a first cost is determined, and only provides a general formula for determining a second cost (*i.e.* depending on said rule and said first cost). Nowhere in the claim is it suggested, as WSOU urges, that the *second cost* is what is charged to the sponsor. A person of ordinary skill reading the claim would be left to wonder how determining a second cost is related to the charging of a first cost to said sponsor. This language simply cannot be untangled

sufficiently that the metes of bounds of this claim can be understood with any conceivable clarity.

The '758 patent specification provides no assistance in unraveling this language.  The reference to charging a "second cost" to the sponsor rests on some "telecommunications billing method well known to the person skilled in the art, but otherwise completely unexplained in the patent.

> Said sponsor's cost C2 is for example send to said billing pool 204 for example to be billed to said sponsor according to a telecommunications billing method well known to the person skilled in the art, *e.g.* according to 3GPP standard.

*Id*. at 5:28-31; *see also*, *Id*. at 6:50-53.

The claim is therefore indefinite because this language, when "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

DATED: January 29, 2021     By:   /s/ *Irene Yang*
                                      Barry K. Shelton
                                      Texas State Bar No. 24055029
                                      SHELTON COBURN LLP
                                      311 RR 620 S, Suite 205
                                      Austin, TX 78734
                                      Telephone: (512) 263-2165
                                      Fax: (512) 263-2166
                                      bshelton@sheltoncoburn.com

                                      *Of Counsel*

                                      Michael J. Bettinger
                                      Irene Yang
                                      SIDLEY AUSTIN LLP
                                      555 California St., Suite 2000
                                      San Francisco, CA 94104
                                      Telephone: (415) 772-1200
                                      Fax: (415) 772-7400
                                      mbettinger@sidley.com
                                      irene.yang@sidley.com

                                      Richard A. Cederoth
                                      John W. McBride
                                      SIDLEY AUSTIN LLP
                                      1 South Dearborn St.
                                      Chicago, IL 60603
                                      Telephone: (312) 853-7000
                                      Fax: (312) 853-7036
                                      rcederoth@sidley.com
                                      jwmcbride@sidley.com

                                      *Attorneys for Defendant Microsoft Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 29, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record as identified below.

*/s/ Irene Yang*
Irene Yang